# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

ERIK A. AHLGREN, *in his capacity as
assignee in the assignment for the benefit
of creditors of Ashby Farmers Co-
Operative Elevator Company*,

                    Plaintiff,

v.

DIEDERIK MULLER *a/k/a Diekie Muller*
and DM SAFARIS *a/k/a Diekie Muller
Hunting Safaris*,

                    Defendants.

Civil No. 19-303 (JRT/LIB)

---

ERIK A. AHLGREN, *in his capacity as
assignee in the assignment for the benefit
of creditors of Ashby Farmers Co-
Operative Elevator Company*,

                    Plaintiff,

v.

JAY LINK and LINK'S WILD SAFARIS,

                    Defendants.

Civil No. 19-305 (JRT/LIB)

---

ERIK A. AHLGREN, *in his capacity as assignee in the assignment for the benefit of creditors of Ashby Farmers Co-Operative Elevator Company*,

Civil No. 19-1576 (JRT/LIB)

              Plaintiff,

v.

JPMORGAN CHASE BANK, N.A., *d/b/a Chase Card Services*,

              Defendant.

ERIK A. AHLGREN, *in his capacity as assignee in the assignment for the benefit of creditors of Ashby Farmers Co-Operative Elevator Company*,

Civil No. 19-1607 (JRT/LIB)

              Plaintiff,

v.

CABELA'S INC. and CAPITAL ONE BANK (USA), NATIONAL ASSOCIATION,

              Defendants.

ERIK A. AHLGREN, *in his capacity as assignee in the assignment for the benefit of creditors of Ashby Farmers Co-Operative Elevator Company*,

                                        Civil No. 19-1647 (JRT/LIB)

                    Plaintiff,

v.

FIRST NATIONAL BANK OF OMAHA, INC.,

                    Defendant.

ERIK A. AHLGREN, *in his capacity as assignee in the assignment for the benefit of creditors of Ashby Farmers Co-Operative Elevator Company*,

                                        Civil No. 19-2385 (JRT/LIB)

                    Plaintiff,

v.

SAMUEL FEJES and FEJES GUIDE SERVICES, LTD.,

                    Defendants.

## MEMORANDUM OPINION AND ORDER

Erik A. Ahlgren and Sarah Catherine Duffy, **AHLGREN LAW OFFICE PLLC**, 220 West Washington Avenue, Suite 105, Fergus Falls, MN 56537; Matthew R. Burton, **MORRISON SUND PLLC**, 5125 County Road 101, Suite 200, Minnetonka, MN 55345, for plaintiff.

Mark G. Schroeder, Adam Gregory Chandler, and Jason R. Asmus, **TAFT STETTINIUS & HOLLISTER LLP**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendants Diederik Muller, DM Safaris, Jay Link, Link's Wild Safaris, Samuel Fejes, and Fejes Guide Services, Ltd.

Johanna R. Hyman, Michael M. Krauss, and Peter Kieselbach, **GREENBERG TRAURIG LLP**, 90 South Seventh Street, Suite 3500, Minneapolis, MN 55402, for defendant JPMorgan Chase Bank, N.A.

Nelson Moon Hua, **K&L GATES LLP**, 1717 Main Street, Suite 2800, Dallas, TX 75201; Joseph C. Wylie, **K&L GATES LLP**, 70 West Madison Street, Suite 3100, Chicago, IL 60602; and James D. Knudsen, **STICH ANGELL KRIEDLER & UNKE PA**, 3601 Minnesota Drive, Suite 450, Minneapolis, MN 55435, for defendants Cabela's Inc. and Capital One Bank (USA), National Association.

Jared M. Goerlitz, **GOERLITZ LAW PLLC**, P.O. Box 25194, 7595 Currell Boulevard, Saint Paul, MN 55125, for defendant First National Bank of Omaha, Inc.

William H. Ingaldson, **INGALDSON FITZGERALD PC**, 813 West Third Avenue, Anchorage, AK 99501, for defendants Samuel Fejes and Fejes Guide Services, Inc.

Plaintiff Erik Ahlgren was appointed assignee for the benefit of creditors of the Ashby Farmers Co-Operative Elevator Company (the "Co-Op") after the discovery of fraud committed by the Co-Op's manager, Jerry Hennessey. Ahlgren initiated these now-consolidated actions pursuant to the Minnesota Uniform Voidable Transactions Act ("MUVTA")[1] to claw back payments made by Hennessey to Defendants—a variety of

---

[1] The Minnesota Uniform Voidable Transactions Act ("MUVTA") was preceded by the Minnesota Uniform Fraudulent Transfers Act ("MUFTA"); in 2015, the Minnesota legislature renamed the act. *See Boosalis*, 974 F.3d at 888 n.2 (citing 2015 Minn. Sess. Law Serv. Ch. 17 (S.F. 1816) (West)). For clarity, the Court will refer to the act as the MUVTA throughout.

safari and hunting guide services and credit card companies—using Co-Op funds for Hennessey's personal purposes.  Ahlgren alleges that Hennessey's transactions with Defendants were actually and constructively fraudulent and therefore voidable under the MUVTA.  The parties have now filed motions for summary judgment.

The Court will deny, at least in part, all Motions.  First, there remain genuine disputes of material facts about whether the Co-Op's creditors acted reasonably in their failure to discover the fraud, and thus the Court cannot determine whether any of Ahlgren's claims are untimely.  Second, as to the merits of Ahlgren's actual fraud claim, the Court cannot weigh the evidence to determine whether Hennessey had actual intent to defraud the Co-Op's creditors at the time of each transaction.  Moreover, Defendants Diekie Muller and DM Safaris, Jay Link and Link's Wild Safaris, and Samuel Fejes and Fejes Guide Services (the "Safari Defendants") may be able to show that Hennessey had apparent authority to enter the transactions, and therefore they may be able to prove a good faith affirmative defense to protect against liability.  Third, because the parties have presented conflicting expert reports regarding the Co-Op's insolvency at the time of the transactions at issue, the Court cannot resolve the constructive fraud claim at this stage.

However, the Court can make several determinations to narrow the cases as they proceed toward trial.  First, Defendants Capital One and Cabela's are each exposed to liability for only a portion of the payments by Hennessey: because Capital One assumed liability for the Cabela's credit card on September 25, 2017, it is not liable for claims

related to payments prior to that date; and Cabela's is not liable for claims related to payments after September 25, 2017.  The Court will accordingly grant, in part, Capital One and Cabela's Motion.  Second, Defendants JPMorgan Chase, Cabela's Inc. and Capital One, and First National Bank of Omaha (the "Credit Card Defendants") will not be able to assert a good faith affirmative defense to the actual fraud claim because there is no evidence in the record showing that the Co-Op could be vicariously liable for the debts satisfied by Hennessey's payments on his personal credit card accounts.   Third, two of the Defendants' general affirmative defenses are inapplicable: in pari delicto, because there is no allegation of wrongdoing on the part of the Co-Op's creditors, merely negligence; and equitable estoppel, because there is no evidence of Defendants' reliance on the creditors' conduct.

## BACKGROUND

## I.    FACTUAL BACKGROUND

### A.    Underlying Criminal Fraud

These consolidated cases arise out of fraud committed by Jerry Hennessey in his role as manager of the Ashby Farmers Co-Operative Elevator Company, which was formed under Minnesota Statutes § 308A and located in Ashby, Minnesota.  (ECF No. 19-1607, Decl. Nelson M. Hua ("Hua Decl.") ¶ 2, Ex. A-4 ("State Court Decision") ¶ 1, Apr. 19, 2021, Docket No. 82-4.)  Hennessey started working for the Co-Op in December 1988.  (Hua Decl. ¶ 2, Ex. A-1 ("1st Hennessey Dep. Excerpts") at 87:8–10, Apr. 19, 2021, Docket No.

82-1.)  As manager, Hennessey oversaw the Co-Op's daily operations, controlled its bank accounts, and obtained loans to support the Co-Op.  (ECF No. 19-305, Aff. Erik A. Ahlgren ("Ahlgren Aff.") ¶ 8, Ex. A ("Plea Agreement") ¶ 2, Feb. 22, 2021, Docket No. 79.)  When Hennessey started, the Co-Op's financial situation was poor, (1st Hennessey Dep. Excerpts at 73:5–8), and Hennessey wanted the Co-Op to improve financially, (ECF No. 19-303, Decl. Jared M. Goerlitz ("Goerlitz Decl.") ¶ 12, Ex. 11 ("2nd Hennessey Dep. Excerpts") at 207:25–208:2, May 18, 2021, Docket No. 135-11.)  Hennessey intended the Co-Op to remain current on its debts, (2nd Hennessey Dep. Excerpts at 208:3–208:14), and employees testified that they were never told to not pay the Co-Op's creditors.  (Hua Decl. ¶ 2, Ex. A-10 ("Goeden Dep.") at 82:13–19, Apr. 19, 2021, Docket No. 82-10.)  During his time as manager, Hennessey also began trading grain futures, supposedly for the benefit of himself and Co-Op member farmers.  (2nd Hennessey Dep. Excerpts at 73:21–74:3.)

In 2018, the Co-Op's primary lender, CoBank, refused to renew the Co-Op's line of credit ("LOC") until the Co-Op provided a financial audit.  (Hua Decl. ¶ 2, Ex. A-5 ("Ahlgren Dep.") at 19:7–22, Apr. 19, 2021, Docket No. 82-5.)  CoBank informed the Co-Op Board of Directors ("Board") that their loan was being called due, and the Board discovered that Hennessey had left town and was not responding to calls.  (ECF No. 19-2385, Decl. William H. Ingaldson ("Ingaldson Decl.") ¶ 3, Ex. B at 6:2–7:6, Apr. 5, 2021, Docket No. 76–2.)  After an investigation, Hennessey was charged with mail fraud in violation of 18 U.S.C. § 1341

and income tax evasion under 26 U.S.C. § 7201, to which he pleaded guilty on February 14, 2019.  (Plea Agreement ¶ 1.)

Hennessey admitted to knowingly and intentionally devising and executing a scheme to "defraud and to obtain money and property from [the Co-Op] and its member farmers" from 2003 through September 2018.  (*Id.* ¶ 2.)  Hennessey further admitted to "using his position and his control over the [Co-Op's] bank accounts" to write checks to himself and third parties for his personal benefit.  (*Id.*)  All told, Hennessey embezzled over $5 million in funds from the Co-Op.  (*Id.* ¶¶ 2, 10.)

According to his admissions in the Plea Agreement, Hennessey hid his fraud by writing descriptions on carbon copies of checks indicating that they were for the purchase of corn, soybeans, supplies, or other operating expenses, which he then provided to the Co-Op's bookkeeper, meaning the Co-Op's accounting records showed that the payments were used for legitimate purposes.  (*Id.* ¶ 2.)  Hennessey also admitted to obtaining an LOC exceeding $7 million for the Co-Op to cover the money used for his personal benefit, and misrepresenting the amount of grain in storage in order to obtain the LOC.  (*Id.*)

### B.    MUVTA Case

Plaintiff Erik Ahlgren, assignee for the benefit of the Co-Op's creditors, is an attorney whose practice focuses on bankruptcy and insolvency.  (Ahlgren Aff. ¶ 7.) Ahlgren initially became involved with the Co-Op's financial problems in early September 2018 when the Board learned that the Co-Op had not paid its largest creditor, CoBank.

(Ahlgren Dep. at 5:4–21.)   The Co-Op executed an assignment for the benefit of its creditors on December 31, 2018.  (Ahlgren Aff. ¶ 3.)  Ahlgren accepted the appointment and committed to liquidate and administer the Co-Op's non-exempt assets and pursue any claims or remedies that may be asserted by either the Co-Op or its creditors.  (Ahlgren Aff. ¶¶ 4–5.)  The Co-Op has a variety of creditors, including individuals and a range of entities, that are owed widely varying amounts.  (*See generally* Ahlgren Aff. ¶ 8, Ex. C ("Claims Register"), Feb. 22, 2021, Docket No. 79.)  CoBank, through which Hennessey obtained the LOC, has the largest claim—over $7.6 million.  (Claims Register at 26.)

In the present matter, Ahlgren initiated actions against numerous individuals and entities that received payments from the Co-Op, seeking to void the transfers as fraudulent.[2]  (*See, e.g.*, ECF No. 19-303, Compl., Feb. 8, 2019, Docket No. 1-1.)  Ahlgren alleges that each of the Defendants received multiple checks over different periods of

---

[2] In addition to the present action, Ahlgren brought a case in Minnesota state court on behalf of the Co-Op against Jerry Hennessey and his wife that resulted in a judgment of $4.9 million against Hennessey.  (State Court Decision at 1, 7.)  Hennessey did not respond to or defend against the action, and the Court entered findings of fact and a default judgment.  (*Id.* at 8.)  Ahlgren also brought a suit against the Board on behalf of the Co-Op's creditors in state court.  (Goerlitz Decl. ¶ 14, Ex. 13, May 18, 2021, Docket No. 135-13.)  Ahlgren alleged that the Board breached its fiduciary duties by never requiring an audit, not inquiring as to checks written by Hennessey, or taking any other actions of an ordinarily prudent person, given that Hennessey's embezzlement was "hiding in plain sight," as evidenced by, for example, reported amounts of grain stored that the elevator could not physically hold.  (Goerlitz Decl. ¶ 14, Ex. 13 ¶¶ 1, 15–16.)  Ahlgren further alleged that Board members knew that Hennessey engaged in grain speculation and asked him to do so for the Board members' own gain, yet grain speculation is "universally condemned by agricultural cooperative boards" because of its potential to harm cooperatives.  (Goerlitz Decl. ¶ 14, Ex. 13 ¶ 17.)  Ahlgren settled with the Board for $1,495,000.  (Ingaldson Decl. ¶ 3, Ex. B at 30:20–23.)

time, ostensibly from the Co-Op, which were coded in the Co-Op's books as corn, soybeans, wheat, supplies, or some other Co-Op purpose, but which were used to pay for Hennessey's hunting trips or credit card bills.[3]   (*See, e.g.*, *id.* ¶¶ 16.)   Pursuant to the MUVTA, Ahlgren asserts that the payments were either actually or constructively fraudulent, and that the Defendants were unjustly enriched by receipt of the payments. (*See, e.g.*, *id.* ¶¶ 27–40.)

Three of the actions involve defendants who are safari or hunting guide services or their owners: Diekie Muller and DM Safaris, Jay Link and Link's Wild Safaris, and Samuel Fejes and Fejes Guide Services.   The Safari Defendants met Hennessey at Safari Club International conventions, where they discussed hunting services and Hennessey told them he owned the Co-Op.  (*See, e.g.*, ECF No. 19-305, Decl. Jay E. Link ("Link Decl.") ¶ 4, Apr. 19, 2021, Docket No. 95.)   Defendants Diekie Muller and DM Safaris (the "Muller Defendants") received three checks from the Co-Op between February 2013 and December 2015, totaling $245,000.[4]  (ECF No. 19-303, Decl. Kimberly Goeden ¶ 3(c), Mar.

---

[3] Hennessey testified in his civil deposition for this case that he used profits from trading grain futures to make the transfers at issue, and therefore the funds were his and not the Co-Ops, and that the checks were coded based on the commodity traded resulting in the winnings.  (*See* 2nd Hennessey Dep. Excerpts at 73:16–74:12.)  One of the Co-Op's bookkeepers testified that she also thought the checks were from Hennessey's winnings, although was never directly told so. (Goeden Dep. at 57:5–58:13.)

[4] Two payments to the Muller Defendants were for Hennessey's personal safari hunting trips organized by the Muller Defendants, and the parties dispute the purpose of the third.  Ahlgren refers to the third payment as a loan, (*see* ECF No. 19-303, Suppl. Aff. Erik A. Ahlgren ¶ 10, Ex. GG at 46, Mar. 10, 2021, Docket No. 107), but the Muller Defendants assert that it was an investment

10, 2021, Docket No. 109.)   Defendants Jay Link and Link's Wild Safaris (the "Link Defendants") received payments from the Co-Op toward Hennessey's personal hunting trips to Uganda, Cameroon, and Nepal.  (Link Decl. ¶¶ 4–7, 11.)  The Link Defendants received ten checks between October 2015 and February 2018, totaling $312,150.  (ECF No. 19-305, Decl. Kimberly Goeden ¶ 3, Feb. 22, 2021, Docket No. 73.)  Lastly, Defendants Samuel Fejes and Fejes Guide Services (the "Fejes Defendants") received six checks from the Co-Op between June 2011 and December 2014 for Hennessey's personal expenses totaling $93,044.  (ECF No. 19-303, Decl. Kimberly Goeden ¶ 3(d).)

The remaining three actions involve defendants that provided banking or credit card services for Hennessey's personal credit cards: JPMorgan Chase Bank, Capital One and Cabela's Inc., and First National Bank of Omaha (the "Credit Card Defendants").  (*See* 1st Hennessey Dep. Excerpts at 212:18–25.)  Defendant JPMorgan Chase Bank ("Chase") received 54 checks between May 2007 and September 2018 totaling $271,968.59.  (ECF No. 19-303, Decl. Kimberly Goeden ¶ 3(a).)  The parties dispute whether all of those payments were for Hennessey's personal expenses or whether some were for legitimate Co-Op uses.  (*See, e.g.*, 1st Hennessey Dep. Excerpts at 212:22–213:20.)  Defendants Capital One Bank and Cabela's received payments from the Co-Op's account toward a Cabela's Club Visa credit card; approximately 112 payments were made toward the

---

toward black impalas that would be credited to his next trip, (ECF No. 19-303, Decl. Diederik J. Muller at 2, Apr. 19, 2021, Docket No. 129.)

Cabela's Club Visa between April 2008 and September 2018, totaling $1,191,852.34.  (ECF

No. 19-303, Decl. Kimberly Goeden ¶ 3(e).)  Defendant First National Bank of Omaha

received approximately 85 checks between November 2003 and September 2018 for a

total of $295,705.28.  (*Id.* ¶ 3(b).)

## II.   PROCEDURAL BACKGROUND[5]

Ahlgren initiated these cases in state court in 2019, and Defendants removed them

to federal court.  (*See, e.g.*, ECF No. 19-303, Notice of Removal, Feb. 8, 2019, Docket No.

1.)  Relevant here, Ahlgren brought claims pursuant to the MUVTA for actual fraud under

Minnesota Statute § 513.44(a)(1) and constructive fraud under § 513.44(a)(2), and for

unjust enrichment.  (*E.g.*, ECF No. 19-303, Compl. ¶¶ 27–49.)  Ahlgren filed separate suits

against each Defendant, and the Court consolidated the cases, with case number 19-303,

against the Muller Defendants, designated as the lead case.  (*See, e.g.*, ECF No. 19-303,

Order of Reassignment of Cases, Feb. 13, 2019, Docket No. 8.)

In some of the cases, Defendants filed motions to dismiss for lack of personal

jurisdiction and failure to state a claim.  (*E.g.*, ECF No. 19-303, Mot. Dismiss, Feb. 28, 2019,

Docket No. 12.)  The Court denied the motions with respect to personal jurisdiction for

the Defendants that remain in the present Motions, but granted the motions to dismiss

---

[5] The consolidated cases have similar though not identical procedural histories.  This section summarizes what has generally taken place across the consolidated cases.

as to unjust enrichment on the basis that the claim was precluded by the MUVTA claims. *See, e.g.*, *Ahlgren v. Muller*, 438 F. Supp. 3d 981, 990 (D. Minn. 2020).

### A.    Expert Witnesses

Plaintiff Ahlgren has filed a Rule 26 expert report by Mark J. Stiegel, CPA, in which Stiegel reviewed financial information and analysis, and opined as to whether the Co-Op was insolvent at all times following December 31, 2007.  (Ahlgren Aff. ¶ 8, Ex. Z ("Stiegel Report") at 780, Feb. 22, 2021, Docket No. 80.)   The analysis portion of the Stiegel Report—which was prepared by Ahlgren—reviews year-end balance sheets from the Co-Op and analyzes adjustments to those balance sheets to account for Hennessey's fraud, such as correcting bank account balances or grain inventory, and concludes whether the Co-Op was insolvent as of the time each sheet was prepared.  (*See, e.g.*, Stiegel Report at 787–90.)

Applying a definition of insolvent as the sum of debts being greater than the sum of assets at a fair valuation, Stiegel opines that the Co-Op was insolvent at all times from December 31, 2007 through discovery of Hennessey's fraud in September 2018.  (*Id.* at 831.)  The Stiegel Report includes some explanation of how the insolvency was hidden, such as a chart showing that the Co-Op's oscillating financial trajectory over the relevant time period, which Stiegel explains can be attributed to the fact that the Co-Op would get its CoBank loan at the start of each year and spring back from the year-end low point.

(*Id.*)  The Report also discusses the Co-Op's method of "loading out" inventory from the accounting system to make it appear that the Co-Op had less debt.  (*Id.* at 832.)

Defendants have submitted two Rule 26 reports.  The first is by Paul E. Martin and focuses on borrowing and lending practices of CoBank, the Co-Op's largest creditor.  (Hua Decl. ¶ 2, Sealed Ex. A-3 ("Martin Report") at 4, Apr. 19, 2021, Docket No. 84.)  According to Martin's analysis, the lending relationship between the Co-Op and CoBank began in 1995, CoBank extended seasonal lines of credit to the Co-Op, starting at $1 million and growing to $8.5 million before CoBank terminated the relationship in September 2018.  (Martin Report at 6.)  Martin opines that CoBank was neither reasonable nor prudent in its lending to the Co-Op because it did not follow standard lending practices or guidelines, such as by failing to require audits and ignoring red flags.  (*Id.* at 7–8.)  Martin opines that if CoBank had acted reasonably, it would have likely discovered Hennessey's misconduct as early as April 2008.  (*Id.* at 7.)

Defendants' other expert report is by Charles E. Finch, who evaluates and critiques the Stiegel Report insolvency analysis.  (Hua Decl. ¶ 2, Ex. A-12 ("Finch Report") at 4, Apr. 19, 2021, Docket No. 82-12.)  Finch states that a proper insolvency analysis typically considers three tests: a balance sheet test, a cash flow test, and an adequate capital test, yet Stiegel's analysis comprises only a balance sheet test.  (Finch Report at 5–6.)  Finch further opines that Stiegel's analysis is speculative and based on unsupported assumptions about balance sheet adjustments and based on unreliable records.  (*Id.* at

6.)  Finch also avers that some of Stiegel's insolvency analysis may simply reflect normal seasonal agricultural cycles, such as carrying higher loan balances outside of the harvest months.  (*Id.* at 13.)

### B.    Motions for Summary Judgment

Following discovery, Ahlgren filed motions for either complete or partial summary judgment against Defendants.  (*E.g.*, ECF No. 19-303, Pl.'s Mot. Summ. J., Mar. 10, 2021, Docket No. 105 (complete); ECF No. 19-1576, Pl.'s Mot. Summ. J., Mar. 10, 2021, Docket No. 61 (partial).)  Ahlgren has moved for summary judgment on Count I for actual fraud against all Defendants.  (*See, e.g.*, ECF No. 19-303, Pl.'s Mem. Supp. Mot. Summ. J. at 7–15, Mar. 10, 2021, Docket No. 106.)  Ahlgren has moved for summary judgment on Count II for constructive fraud only as to the Link Defendants, arguing that the record conclusively establishes that the Co-Op was insolvent during the entire timeframe during which Hennessey made payments to the Link Defendants, 2014 to 2018.  (*See* ECF No. 19-305, Pl.'s Mem. Supp. Mot. Summ. J. at 26–32, Feb. 22, 2021, Docket No. 71.)

The Safari Defendants have moved for summary judgment on Counts I and II.  (*See, e.g.*, ECF No. 19-303, Defs.' Mot. Summ. J., Apr. 19, 2021, Docket No. 126.)  The Credit Card Defendants have moved for partial summary judgment, seeking dismissal of Count I for actual fraud as to transfers dated before approximately May 24, 2013, based on expiration of the statute of limitations, (*see, e.g.*, ECF No. 19-1607, Defs.' Mot. Partial Summ. J. at 1, Apr. 19, 2021, Docket No. 80), and in full as to Count II for constructive

fraud, (*see, e.g.*, ECF No. 19-1647, Defs.' Mot. Summ. J. at 1, Apr. 19, 2021, Docket No. 67.)  Capital One's Motion separates Count I for actual fraud into three time frames, seeking summary judgment on all transfers before May 24, 2013, against Cabela's on transfers between May 24, 2013 and September 25, 2017, and against Capital One on transfers after September 25, 2017, when Capital One assumed liability related to Cabela's Club Card accounts.  (ECF No. 19-1607, Defs.' Mot. Partial Summ. J. at 1.)  Some of the Defendants' briefing for the Motions is consolidated but not entirely, as there are distinct facts and legal issues related to various cases.  (*See, e.g.*, ECF No. 19-303, Defs.' Consol. Mem. Opp. Mot. Summ. J., May, 18, 2021, Docket No. 134; ECF No. 19-1647, Defs.' Mem. Opp. Pl. Mot. Summ. J. & Supp. Defs.' Mot. Summ. J., Apr. 5, 2021, Docket No. 69.)

The Court now considers all pending motions for summary judgment.

## DISCUSSION

### I.   STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. At the summary judgment stage, the Court may not make credibility determinations or weigh the evidence before it. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## II.   ANALYSIS

Ahlgren asserts claims under the MUVTA for actual fraud and constructive fraud against all Defendants, alleging that Hennessey's payments to Defendants are voidable under Minnesota Statutes § 513.44(a). Ahlgren, as assignee for the benefit of creditors, has standing to assert the creditors' claims under the MUVTA in accordance with Minnesota Statute § 577.07.

### A.   Statute of Limitations

Defendants contend that some of the payments at issue were made outside the applicable statute of limitations for MUVTA claims; if so, Ahlgren cannot recover those transfers, and Defendants are entitled to judgment as a matter of law with respect to them. Because MUVTA does not contain a statute of limitations, the standard six-year

statute of limitations period applies to claims for actual and constructive fraud.  *See* Minn. Stat. § 541.05; *Finn v. Alliance Bank*, 860 N.W.2d 638, 658 (Minn. 2015) (stating six-year limit on claims for actual fraud); *Finn v. Alliance Bank*, 838 N.W. 2d 585, 594 (Minn. Ct. App. 2013) (stating six-year limit on claims for constructive fraud).  It is undisputed that some transfers at issue were made more than six years prior to Ahlgren filing the complaints, since the lawsuits cover conduct that occurred between 2003 and 2018, and the actions were not initiated until 2019.

However, Ahlgren maintains that claims arising from all transfers are timely because the fraud was not discovered until September 2018.  The statute of limitations for fraud begins to run at the time of "discovery by the aggrieved party of the facts constituting the fraud."   Minn. Stat. § 541.05(6); *see also Finn*, 860 N.W.2d at 658 (concluding that § 514.05, subd. 1(6) applies to actual fraud claims under the MUVTA). "The facts constituting the fraud are deemed to have been discovered when they were actually discovered or, by reasonable diligence, should have been discovered."  *Doe v. Archdiocese of St. Paul*, 817 N.W.2d 150, 172 (Minn. 2012) (quotation omitted).  The standard is objective, and an aggrieved party's subjective claim that they did not actually know the facts constituting fraud is immaterial.  *See id.*  The plaintiff bears the burden of proof, and "due diligence in the statute of limitations context is ordinarily a question of fact," but "[w]here the evidence leaves no room for reasonable minds to differ on the

issue" it may be resolved as a matter of law. *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684–85 (Minn. Ct. App. 2010).

Here, reasonable minds could differ about whether the Co-Op's creditors should have discovered Hennessey's fraud earlier than September 2018, had they exercised reasonable diligence. Defendants' expert witness Martin opines that CoBank failed to follow its own internal procedures, did not require financial audits, did not adequately correspond with the Board, and ignored other red flags in its interactions with Hennessey and the Co-Op—and thus did not act as a reasonable lender and could have discovered the fraud sooner if it had. Defendants further assert that Ahlgren's own admissions[6] and other court filings[7] show that the fraud could have been discovered through reasonable diligence. Yet, CoBank has testified that it followed industry standards in engaging with the Co-Op and was nonetheless unaware of Hennessey's fraud. Moreover, the Martin Report only touches on CoBank's conduct, without examination of the reasonableness of other Co-Op creditors' conduct.

---

[6] In response to request for admissions in the Capital One case, Ahlgren admitted that he made statements to agricultural news outlets, such as that Hennessey's conduct was "really the simplest of all frauds" and "there were extremely poor internal controls" at the Co-Op. (ECF No. 19-1607, Hua Decl. ¶ 2, Ex. A-14 at 3–4, Apr. 19, 2021, Docket No. 82-14.)

[7] For example, in the civil case brought by Ahlgren on behalf of the creditors against the Board, Ahlgren stated that Hennessey's "scheme was there in plain sight." (ECF No. 19-1607, Ex. A-13 at 3, Apr. 19, 2021, Docket No. 82-13.)

The Court cannot weigh the conflicting assessments of creditors' diligence and, as such, there remains a genuine dispute of material fact as to whether the Co-Op's creditors, especially CoBank, should have discovered the fraud earlier.  The Court will therefore deny all Motions as they relate to payments or transfers to Defendants made more than six years prior to commencement of the present actions.   A jury will decide the issue.

### B.    Capital One and Cabela's Liability

Another initial matter to address is the division of liability between Defendants Capital One and Cabela's.  Capital One became the issuer for the Cabela's Club Visa as of September 25, 2017 and therefore seeks summary judgment regarding all transfers dated prior to September 25, 2017, and Cabela's seeks summary judgment regarding all claims arising from transfers dated on or after September 25, 2017.  Ahlgren agrees that Cabela's does not face liability after its credit card became Capital One's responsibility, but argues that Capital One assumed all of Cabela's liabilities without limit.  Capital One contends that its assumption of Cabela's liabilities did not include any related to transfers occurring prior to September 25, 2017.

Pursuant to the Purchase Agreement, Capital One assumed "any expenses, liabilities or obligations . . . to the extent related to any of the Accounts . . . arising or accruing during the period beginning on or after the Cut-Off Time[.]"  (*See* ECF No. 19-1607, 2nd Ahlgren Aff. ¶ 5, Ex. NN ("Purchase Agreement") at 226, May 10, 2021, Docket

No. 88.) "Cut-Off Time" is defined as "the time when the processing of the Accounts by Seller, its Affiliates and/or their respective contractors for the day immediately preceding the Closing Date has been completed."  (Purchase Agreement at 214.)  Because the Purchase Agreement's language limits Capital One's assumed liabilities based on the Cut-Off Time, Capital One cannot be liable for Ahlgren's claims related to transfers made prior to that date—set as September 25, 2017, according to company records.[8]  The Court will therefore grant summary judgment to Capital One insofar as Ahlgren seeks to void transactions prior to September 25, 2017, and grant summary judgment to Cabela's as to transactions after September 25, 2017.

### C.    Actual Fraud

Turning to the substance of the matter, the Court examines Ahlgren's claim of actual fraud against Defendants.  Under the MUVTA, "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor[.]"  Minn. Stat. § 513.44(a)(1).  Fraudulent intent is ordinarily a question of fact and is decided as a matter of law only when no genuine issue of material fact exists.  *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 65–66 (Minn. 2014).

---

[8] The date September 25, 2017 appears to come from an 8-K dated September 25, 2017, which states that "This Current Report on Form 8-K is being filed in connection with the closing on September 25, 2017 of the transactions contemplated by that certain Agreement and Plan of Merger" between Cabela's and Capital One.  (Purchase Agreement at 501.)

Ahlgren must prove that the Co-Op made the transfers with the actual intent to hinder, delay, or defraud at least one creditor.  For purposes of claims under the MUVTA, Hennessey's intent is imputed to the Co-Op.  *See Ahlgren v. JP Morgan Chase Bank, N.A.*, No. 19-1576, 2020 WL 553484, at *3 (D. Minn. Feb. 4, 2020).  Corporate intent under the MUVTA is derived from the intent of natural persons in control; because Hennessey was in control of the day-to-day activities and operations of the Co-Op, he controlled the transactions at issue and his intent can therefore be imputed to the Co-Op.  *Id.*

### 1.    Intent to Defraud Creditors

The Court previously informed the parties that "fraudulent intent may [] be established through Hennessey's Plea Agreement."  *Ahlgren v. Link*, No. 19-305, 2019 WL 3574598, at *5 (D. Minn. Aug. 6, 2019).  Ahlgren maintains that the Plea Agreement constitutes direct proof of fraudulent intent.  The Plea Agreement admits that Hennessey "knowingly and intentionally devised and executed a scheme to defraud and to obtain money and property from the Ashby Farmers' Co-operative Elevator Company [] and its member farmers by means of materially false and fraudulent pretenses, representations, and promises, and concealment of material facts."  (Plea Agreement ¶ 2.)  Further, "[u]sing his position and his control over the Co-op's bank accounts, [Hennessey] wrote checks to himself and to third parties for his own personal benefit" and that Hennessey "was not authorized by the Co-op to use its funds for such personal purposes."  (*Id*.)

-22-

Hennessey's plea is a binding admission of criminal fraudulent conduct.  But the agreement only references intent to defraud creditors—as opposed to intent to defraud the Co-Op itself—in relation to Co-Op member farmers.  Claims by Co-Op member farmers are included in the Claims Register,[9] showing that they are among the Co-Op's creditors, but member farmers straddle the role of creditor and the Co-Op itself,[10] and Hennessey's admission of intent to defraud Co-Op member farmers cannot extend to establish intent to defraud the Co-Op's creditors in general.

Furthermore, the Plea Agreement does not include any admissions about Hennessey's intent to defraud creditors on a transfer-by-transfer basis.  Under Minnesota law, a creditor must prove the elements of a fraudulent transfer claim with respect to each transfer.  *Finn*, 860 N.W.2d at 647; *see also Kelley as Tr. for PCI Liquidating Tr. v. Boosalis*, 974 F.3d 884, 891 (8th Cir. 2020) ("[MUVTA] requires that each fraudulent transfer claim be determined in light of the facts and circumstances of each case on a transfer-by-transfer basis." (quotation omitted).)  Minnesota courts have rejected the so-called "Ponzi scheme presumption" for MUVTA claims, meaning there is no presumption of intent to defraud based on the existence of a Ponzi scheme or other pattern or scheme

---

[9] The Claims Register does not identify or designate member farmers, but presumably some or all of the individuals with claims are Co-Op members, and Defendants do not dispute the identification of Co-Op member farmers as being among the Co-Op's creditors.

[10] Under Minnesota cooperative law, "member" is defined as a "member or a stockholder of a cooperative who is entitled to vote."  Minn. Stat. § 308A.005, subd. 9.

of transactions by the debtor. *See, e.g., Finn*, 860 N.W.2d at 647; *see also In re Polaroid Corp.*, 543 B.R. 888, 908–09 (Bankr. D. Minn.), *aff'd sub nom. Stoebner v. Opportunity Fin., LLC,* 562 B.R. 368 (D. Minn. 2016), *aff'd*, 909 F.3d 219 (8th Cir. 2018). Because the Plea Agreement does not examine each transaction individually or in any disaggregated context, it alone is insufficient to establish Hennessey's intent to defraud creditors.

However, direct proof of fraud in the form of the Plea Agreement is not Ahlgren's only option for proving his actual fraud claim, as courts often rely on "badges of fraud" because there is rarely direct proof of intent to defraud. *Citizens State Bank*, 849 N.W.2d at 60. The MUVTA provides a non-exhaustive list of badges of fraud, such as a transfer being concealed and the debtor's insolvency. *See* Minn. Stat. § 513.44(b). If a confluence of badges is present, then an inference of fraud is established and must be rebutted by clear evidence of a legitimate purpose for the transaction. *See Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000); *Citizens State Bank*, 849 N.W.2d at 66. Evidence supporting an inference of fraud includes Hennessey's admissions in the underlying criminal case; concealment by coding the payments as being for corn, soybeans, or other Co-Op purposes; the Co-Op's use of increasingly large seasonal lines of credit; and the Co-Op's eventual insolvency.[11] Further, evidence outside the Plea Agreement shows the coding

---

[11] Whether the Co-Op was insolvent at all relevant times remains a fact question, as discussed in more detail below in relation to constructive fraud.

of each transaction at issue, so Ahlgren argues that the transfer-by-transfer requirements are satisfied.

Yet evidence contradicting an inference of fraud also exists in the record.  First, in addition to Hennessey's admissions in the Plea Agreement, Hennessey testified in a deposition for the present civil actions.[12]  Hennessey has stated that he intended to pay the Co-Op's creditors throughout his time as manager and that he worked to improve the Co-Op's financial position during his tenure.  Hennessey also testified that he did not have any intent toward the Co-Op's creditors when trading grain futures or making the payments to the Defendants.  Rather, he believed the profits he earned from trading grain futures belonged to him, and he testified that some of the payments at issue were for legitimate Co-Op expenses.  Defendants have also submitted an expert report, the Finch Report, that calls into question whether the Co-Op was insolvent during the relevant timeframe.  Moreover, a reasonable jury could find that the evidence regarding the coding of transactions is insufficient to establish an inference of fraud with respect to every single transfer.

Hennessey's deposition may be less persuasive, given his conviction for mail and tax fraud, but determining Hennessey's overall credibility regarding his intentions would

---

[12] Ahlgren appears to raise the question of whether Hennessey's civil testimony is admissible evidence if it contradicts the Plea Agreement.  However, the testimony that the Court considers here is not contradictory; for example, there is nothing in the plain text of the Plea Agreement about creditors beyond the member farmers, such as CoBank.

-25-

require the Court to make a credibility assessment, which it cannot do at this stage. Additionally, the Court cannot weigh the expert reports to determine whether or when the Co-Op was insolvent.  All told, the Court finds that there remain factual questions regarding Hennessey's actual intent to defraud the Co-Op's creditors and whether there are sufficient badges of fraud to give rise to an inference of fraud.

### 2. Good Faith Affirmative Defense to Actual Fraud

Although there remains a factual dispute about actual fraud and the evidence must be submitted to a factfinder on the issue of actual intent to defraud, the Court will consider whether Defendants have nonetheless proven the good faith affirmative defense to actual fraud as a matter of law.  For claims of actual fraud under § 513.44(a)(1), a transfer is not voidable "against a person that took in good faith and for a reasonably equivalent value given the debtor[.]"  Minn. Stat. § 513.48(a).

### a. Reasonably Equivalent Value

The current text of the MUVTA specifies that the reasonably equivalent value must have been given to or received by the debtor—here, the Co-Op—but before a 2015 amendment, § 513.48(a) read: "A transfer or obligation is not voidable under section 513.44(a)(1), against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."  2015 Minn. Sess. Law, Ch. 17 S.F. No. 1816, Minn. Stat. § 513.48, https://www.revisor.mn.gov/laws/2015/0/17/.  Because the pre-2015 version did not specify that the reasonably equivalent value be attributed

to the debtor, Defendants advocate that the Court should interpret the prior version of the statute such that the good faith affirmative defense applies whenever anyone received reasonably equivalent value. According to Defendants, this interpretation would mean that the defense applies to all transfers made prior to enactment of the 2015 amendments since Hennessey indisputably received the requisite value in exchange for his payments to Defendants.

Defendants point to a case interpreting a provision of the Iowa Uniform Fraudulent Transfer Act identical to the pre-2015 Minnesota provision. *See In re Chapman Lumber Co., Inc.*, 2007 WL 2316528 (Bankr. N.D. Iowa Aug. 8, 2007). The Iowa bankruptcy court concluded that to successfully establish the affirmative defense, value need not be received by the debtor based on the plain language of the statute. *Id.* at *2, *6. The court found that the language of the statute did not require reasonably equivalent value be received by the debtor, and the analysis should be based on the perspective of what the defendant gave, rather than what the debtor received. *Id.* at *6. Defendants urge the Court read the prior iteration of Minnesota Statutes § 513.48 in the same manner.

But despite the silence of the pre-2015 version of Minnesota Statues, the Minnesota Supreme Court has indicated that reasonable equivalent value must have gone to the debtor, and the Court will take its cues from the binding state authority instead. In *Finn v. Alliance Bank*, decided before the 2015 MUVTA amendments, the Minnesota Supreme Court observed that "the determination of **whether a debtor received**

-27-

**reasonably equivalent value** in exchange for a transfer of its assets depends on the facts and circumstances of each case." *Finn*, 860 N.W.2d at 650 (emphasis added). In other words, the Minnesota Supreme Court understood the pre-2015 version of § 513.48 as meaning that the reasonably equivalent value must have gone to the debtor in order to successfully establish the affirmative defense. As such, the Court will require Defendants to establish, for all relevant transactions, that the debtor received reasonably equivalent value.

Applying the affirmative defense, the Court examines whether the Co-Op received reasonably equivalent value for the payments Hennessey made to Defendants. Defendants maintain that the affirmative defense precludes liability because, pursuant to agency law, the Co-Op cloaked Hennessey with apparent authority, making the Co-Op vicariously liable for all of Hennessey's transactions, and therefore the Co-Op received reasonably equivalent value from Defendants because the payments satisfied the Co-Op's debts.

The laws of principals and agents supplement the MUVTA, *see* Minn. Stat. § 513.50, and under agency law, a principal is bound not only by its agent's actions pursuant to actual authority but also by those for which the principal has apparently delegated authority to the agent, *McGee v. Breezy Point Estates*, 166 N.W.2d 81, 89 (Minn. 1969). Apparent authority is measured from the perspective of a third party interacting with the agent, and whether an agent had apparent authority is a question of

fact. *See, e.g., Hagedorn v. Aid Ass'n for Lutherans*, 211 N.W.2d 154, 158 (Minn. 1973). "In determining whether apparent authority exists, the court may consider any statements, conduct, lack of ordinary care, or manifestations of the principal's consent, such that a third party might be justified in concluding that the agent acted with apparent authority." *Powell v. MVE Holdings, Inc.*, 626 N.W.2d 451, 457 (quotation omitted).

Minnesota law sets forth two basic requirements for establishing a claim against a principal based on apparent authority. The first is that the principal must have either "held the agent out as having authority" or "knowingly permitted the agent to act on its behalf." *Hockemeyer v. Pooler*, 130 N.W.2d 367, 375 (Minn. 1964). The second is "reliance," meaning that the plaintiff was aware of these representations of authority by the principal. *See Foley v. Allard*, 427 N.W.2d 647, 653 (Minn. 1988); *see also Popovich v. Allina Health Sys.*, 946 N.W.2d 885, 890–91 (Minn. 2020) ("A business or individual—a principal—is vicariously liable under the doctrine of apparent authority where they hold an agent out as having authority or knowingly permit the agent to act on their behalf, and the agent is negligent." (quotation omitted)).

As to the Credit Card Defendants, the record is devoid of evidence regarding when or how the Co-Op allegedly represented or condoned Hennessey's use of Co-Op checks to pay off his personal credit cards. Even assuming that it was the Co-Op's silence which could have conferred apparent authority on Hennessey from the Credit Card Defendants' perspectives, there is no evidence in the record showing when or how the Defendants

developed such an understanding.  Without evidence of either the Co-Op's conduct or the Credit Card Defendants' perspective, no reasonable jury could find that the Credit Card Defendants thought Hennessey had authority from the Co-Op to issue Co-Op checks to pay off his personal accounts.

Moreover, even if a jury could reasonably conclude that Hennessey had apparent authority to use Co-Op funds, any debts with the Credit Card companies were in Hennessey's name, not the Co-Op's.  Although a principal is vicariously liable for debts incurred by its apparent agent, *Opatz v. John G. Kinnard & Co. Inc.*, 454 N.W.2d 471, 473–74 (Minn. App. 1990), a principal is not vicariously liable for debt incurred in the agent's name without direct or indirect benefit to the principal.  *See In re Whaley*, 229 B.R. 767, 775–76 (Bankr. D. Minn. 1999).  And, if the principal is not vicariously liable for the debt, then there is no reasonably equivalent value through satisfaction of that debt.  *See Finn*, 860 N.W.2d at 650.  The accounts serviced by the Credit Card Defendants were in Hennessey's name only, and thus the Co-Op would not be vicariously liable for Hennessey's debts to the Credit Card Defendants.  As such, even if apparent authority did exist, the Co-Op still could not have received reasonably equivalent value through the payment of an antecedent debt.  The Court will therefore grant Ahlgren's Motion insofar as he seeks to prevent the Credit Card Defendants from asserting the good faith affirmative defense on Count I for actual fraud.

By contrast, when considering Hennessey's payments to the Safari Defendants, there is evidence in the record sufficient to create a fact dispute as to whether Hennessey had apparent authority to use Co-Op funds in the eyes of the Safari Defendants. The Safari Defendants met Hennessey in person, Hennessey told them that he owned the Co-Op, and the Safari Defendants were aware that he used Co-Op checks to make payments and believed he had authority to do so. If Hennessey had apparent authority, then the Co-Op would have incurred vicarious liability for his transactions with the Safari Defendants and, when the Safari Defendants were paid, the Co-Op would have received reasonably equivalent value from the satisfaction of debts for which it was liable. *See Finn*, 860 N.W.2d at 650. Because a factfinder must assess the credibility of the Safari Defendants' understanding of Hennessey's relationship to the Co-Op, the Safari Defendants will have the opportunity to prove their affirmative defense at trial.

### 3.    Subsequent Transferee Defense – Fejes Defendants

In addition to the good faith affirmative defense, the Fejes Defendants also assert the subsequent transferee defense. Section 513.48(a) exempts transactions to "any subsequent transferee" from being voided under § 513.44(a)(1). The Fejes Defendants argue they were not initial transferees because Hennessey first committed civil theft and conversion from the Co-Op with respect to the funds at issue.

To be an initial transferee, an individual or entity must have dominion and control over the transferred funds. *In re Reeves*, 65 F.3d 670, 676 (8th Cir. 1995). In the context

of fraud, however, a majority of circuits find that a corporate insider "who misappropriates company funds to satisfy personal obligations is not an initial transferee." *Matter of Walldesign, Inc.*, 872 F.3d 954, 964 (9th Cir. 2017) (citation omitted). Rejecting the insider as the initial transferee avoids the "anomalous result that every agent or principal of a corporation would be deemed the initial transferee when he or she effected a transfer of property in his or her representative capacity." *In re Video Depot*, 127 F.3d 1195, 1199 (9th Cir. 1997). Any other rule would "give[] too much power to an unscrupulous insider to effect a fraudulent transfer." *Id.* (quotation omitted). The Court finds the majority approach sound and will adopt it to avoid tacitly authorizing potentially fraudulent transfers. Hennessey is therefore not deemed an initial transferee of the funds used to make the payments at issue, and the Court will deny the Fejes Defendants' subsequent transferee affirmative defense.

In sum, the Court denies all Motions with respect to Count I for actual fraud because there remains a genuine dispute of material fact as to whether Hennessey actually intended to defraud the Co-Op's creditors at the time of each transfer that Ahlgren now seeks to void. Additionally, the Safari Defendants may try to prove a good faith defense at trial based on evidence that they believed Hennessey had apparent authority to use Co-Op funds for his purchases. The Credit Card Defendants, however, cannot assert the good faith defense because no evidence in the record supports a finding

that the Credit Card Defendants perceived Hennessey as having authority to pay his

personal accounts with Co-Op funds.

### D.    Constructive Fraud

Ahlgren also seeks to claw back payments made to Defendants through a

constructive fraud theory.  Transactions are constructively fraudulent when a debtor

makes a transfer:

> without receiving a reasonably equivalent value in exchange
> for the transfer or obligation, and the debtor:
>
> > (i)    was engaged or was about to engage in a
> > business or a transaction for which the
> > remaining assets of the debtor were
> > unreasonably small in relation to the business or
> > transaction; or
> >
> > (ii)    intended to incur, or believed or
> > reasonably should have believed that the
> > debtor would incur, debts beyond the debtor's
> > ability to pay as they became due.

Minn. Stat. § 513.44(a)(2).  In other words, to establish constructive fraud, the moving

party must establish (1) that the debtor did not receive reasonably equivalent value in

exchange for the transfers, and (2) that the debtor was insolvent at the time of the

transfer or the transfer made the debtor insolvent.

### 1.    Reasonably Equivalent Value

As explained above, no reasonable jury could find that the Co-Op received

reasonably equivalent value for the payments made toward Hennessey's personal credit

cards, and Ahlgren has therefore established the first element of constructive fraud as to

the Credit Card Defendants.  However, there remains a genuine dispute of material fact

about whether the Co-Op received reasonably equivalent value via a satisfaction of debts

for which it would be vicariously liable through Hennessey's payments to the Safari

Defendants.  Because a factfinder must assess the evidence about Hennessey's purported

apparent authority to contract for safari and hunting services, the Court cannot

determine the first element of constructive fraud as a matter of law with respect to the

Safari Defendants.

### 2.    Insolvency

Under the MUVTA, "a debtor is insolvent if, at a fair valuation, the sum of the

debtor's debts is greater than the sum of the debtor's assets."  Minn. Stat. § 513.42(a).

Additionally, a "debtor that is generally not paying the debtor's debts as they become due

other than as a result of a bona fide dispute is presumed to be insolvent."  *Id.* § 513.42(b).

Section 513.42(a) has been interpreted to "contemplate[] a straightforward meaning: the

'balance sheet' conception of insolvency, debts versus assets."  *In re Petters Co. Inc.*, 495

B.R. 887, 923 (Bankr. D. Minn. 2013).  An insolvency analysis in the context of constructive

fraud requires a transfer-by-transfer analysis; the entity must have been insolvent at the

time of each transfer, as there is no presumption of insolvency under the MUVTA.  *See*

*Finn*, 860 N.W.2d at 648–49 (rejecting a presumption of insolvency for Ponzi schemes

"without regard to whether the debtor was paying its debts as they became due or whether its debts exceeded its assets").

The parties have submitted conflicting expert reports regarding the Co-Op's insolvency during the relevant period.  At the summary judgment stage, the Court may not make credibility determinations or weigh the evidence before it.  Even so, Defendants argue that Ahlgren's expert report, the Stiegel Report, is inadmissible and without it, Ahlgren cannot prove that the Co-Op was insolvent at all relevant times.

Under Federal Rule of Evidence 702, expert testimony must be based on specialized knowledge useful to the factfinder, the proposed witness must be qualified, and the evidence must be reliable or trustworthy.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  The district court has a gatekeeping obligation to ensure all testimony admitted under Rule 702 satisfies these prerequisites and that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 597 (1993).  The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the expert is qualified, that the expert's methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).  However, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Id.* at 758.  "Only if the expert's opinion is so fundamentally unsupported that it can offer

no assistance to the jury must such testimony be excluded."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quotation omitted).

Defendants contend the Stiegel Report is inadmissible because Ahlgren wrote the analysis portion of the report himself and therefore Stiegel has offered his client's opinion as his own.  Indeed the analysis portion of the Stiegel Report is nearly identical to the analysis contained in Ahlgren's Affidavit, (*see* ECF No. 19-305, Ahlgren Aff. ¶ 12, Feb. 22, 2021, Docket No. 78); the Stiegel Report is merely revised to eliminate use of the first-person perspective, and Stiegel has added concluding statements regarding whether he believes the Co-Op was insolvent based on the analysis.  However, the Stiegel Report does not conceal Ahlgren's role in drafting the analysis: the introduction discloses that Ahlgren prepared the analysis and that Stiegel reviewed it, and Stiegel openly discussed the arrangement at his deposition.

Whether the Stiegel Report source material—the Ahlgren Affidavit—is itself admissible is another question.  Under Federal Rule of Evidence 701(c), if a witness is not testifying as an expert, testimony in the form of an opinion cannot be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," and a witness who is testifying as an expert must be qualified by knowledge, skill, experience, training or education, Fed. R. Evid. 702.  Federal Rule of Civil Procedure 26(a)(2) also requires disclosure of expert testimony and that such disclosure be accompanied by a written report.  Ahlgren's analysis is likely based on technical or specialized knowledge and

therefore cannot be offered as a lay opinion, and thus is likely inadmissible unless Ahlgren can be qualified as an expert witness.[13]  For the present Motions, however, the Court will defer deciding the admissibility of Ahlgren's analysis until trial.

Even if the Ahlgren Affidavit is inadmissible, the Stiegel Report may be admissible. Under Rule of Evidence 703, expert reports can be based on inadmissible facts and data, so long as "experts in the particular field would reasonably rely on [the] kinds of facts or data in forming an opinion on the subject[.]"  The parties do not directly address whether it is reasonable for Stiegel to rely on an analysis like Ahlgren's, but Stiegel testified at his deposition that Ahlgren's work is what he would expect to see from an accounting firm. (*See, e.g.*, Goerlitz Decl. ¶ 26, Ex. 25 at 28:2–11, May 18, 2021, Docket No. 135-25.)

Furthermore, although Defendants argue that Ahlgren's involvement in preparing the Stiegel Report goes beyond assistance permitted by Rule 26(a)(2), Stiegel's deposition shows that he understood Ahlgren's analysis and thoroughly reviewed it, and thus the issues do not appear to justify outright exclusion.  *Compare Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 941–46 (E.D. Mich. 2014) (excluding an expert report prepared with assistance of counsel where the expert did not understand its contents or the factors employed to write it), *with Abernathy v. Union Pac. R. Co.*, No. 08–4187, 2011 WL

---

[13] The need for Ahlgren to be qualified as an expert to make his affidavit admissible highlights the many roles Ahlgren is attempting to serve in this litigation—plaintiff, witness, counsel—and the problems these layers pose.  As these consolidated cases progress toward trial, Ahlgren will need to narrow the scope of his involvement to be able to present the case to a jury.

1397439, at *5 (E.D. Ark. 2011) (admitting an expert report prepared with assistance of counsel where the expert adopted the report as accurately reflecting their opinion and expected testimony). At this point, the Court will keep the Stiegel Report in the record, but the Court notes that whether the report is ultimately admissible can be revisited, should the case go to trial.

Because the Stiegel Report will remain in the record at this time, there remains a genuine dispute of material fact as to the Co-Op's insolvency at the time of the transactions at issue. Ahlgren's analysis and expert report conclude that the Co-Op was insolvent at all relevant times, but Defendants' expert undercuts the methodology and conclusions of the Stiegel Report and Ahlgren's analysis, both of which focus solely on annual balance sheet data points.[14] The complex and cyclical nature of agricultural finances cast doubt on a narrow view of insolvency that fails to consider cash flow, especially when there is evidence in the record that, at least for part of the relevant time frame, the Co-Op paid its creditors. Another potential shortcoming with the annualized nature of the insolvency analysis is whether it establishes the requisite transfer-by-transfer showing of insolvency. Further, Defendants have raised doubts about the credibility of the Stiegel Report and Ahlgren analysis.

---

[14] In addition to potential shortcomings with the annualized nature of the insolvency analysis raised in the Finch Report, the Stiegel Report may also be insufficient with respect to satisfying the requisite transfer-by-transfer showing of insolvency.

In light of these issues of credibility and substance, the Court finds that Ahlgren has not shown, as a matter of law, that the Co-Op was insolvent at any of the relevant times, and the Court will therefore deny Ahlgren's Motion and deny Defendants' Motions on Count II for constructive fraud.

### E.   Affirmative Defenses

Defendants raise a number of general affirmative defenses.   First, Defendants assert the doctrine of in pari delicto, which bars a plaintiff's recovery due to their own wrongful conduct.   *See Pinter v. Dahl*, 486 U.S. 622, 632 (1988).   The parties dispute whether the doctrine can be applied, as a matter of law, to an assignee for the benefit of creditors such as Ahlgren.   Courts have found that the doctrine does not apply to claims asserted by an equity receiver appointed for a corporation, *see, e.g.*, *Kelley, Tr. BMO Litig. Tr. v. BMO Harris Bank N.A.*, No. 19-1756, 2020 WL 1227725, at *5–6 (D. Minn. Mar. 13, 2020), but does apply to a bankruptcy trustee, *see, e.g.*, *Christians v. Grant Thornton LLP*, 733 N.W.2d 803, 814 (Minn. App. 2007).   This is because, a " trustee's ability to assert causes of action on behalf of the bankrupt estate is subject to any equitable or legal defenses that could have been raised against the debtor," *Grassmueck v. Am. Shorthorn Ass'n*, 402 F.3d 833, 836 (8th Cir. 2005), whereas, "when a receiver has been appointed for a corporation, the wrongdoer (the corporation) is removed from the picture and, hence, in pari delicto does not apply,"  *Kelley v. Coll. Of St. Benedict*, 901 F. Supp. 2d 1123, 1129 (D. Minn. 2012).

-39-

Defendants rely on CoBank's and the Co-Op's other creditors' purported failure to act as reasonable lenders to justify application of in pari delicto. But this position amounts to an argument that the Co-Op's creditors were negligent in not discovering Hennessey's fraud, not that the creditors engaged in wrongdoing as required for application of in pari delicto. There may be some case in which a creditor conspired or participated in underlying fraud such that it should be barred from clawing back a fraudulent transfer, but there are no such allegations or evidence in the record here and, as such, the "wrongdoer has been removed from the picture." *Kelley*, 901 F. Supp. 2d at 1129; *see also Lustgraaf v. Behrens*, 619 F.3d 867, 885 (8th Cir. 2010) (noting that the doctrine precludes a plaintiff from recovery where they "participated in the alleged wrongdoing"). As a matter of law, in pari delicto does not preclude Ahlgren's claims.

Second, Defendants assert an equitable estoppel defense. A party asserting equitable estoppel must prove "(1) that representations were made; (2) that the party reasonably relied on such representations; and (3) that the party will be harmed if estoppel is not applied." *EEP Workers' Comp. Fund v. Fun & Sun, Inc.*, 794 N.W.2d 126, 134–35 (Minn. App. 2011). Estoppel is ordinarily a question of fact. *N. Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979). Defendants assert that, because "a representation may consist of silence," *Messina N. Cent. Distrib. Inc.*, No. 14-3101, 2017 WL 2345572, at *3 (D. Minn. May 30, 2017) (quotation omitted), there are material questions of fact as to whether Ahlgren, as representative of the Co-Op's creditors, should

-40-

be estopped from asserting his claims because of CoBank's silence regarding Hennessey's fraud.  But Defendants have not explained how or why they relied on CoBank's silence in accepting payments from the Co-Op.  As such, Defendants have failed to prove the elements of estoppel and the defense is inapplicable as a matter of law.

Third, Defendants assert that the Co-Op unreasonably delayed asserting its rights to void the payments at issue and thus the doctrine of laches forecloses Ahlgren's present actions.  Laches is an equitable doctrine that permits a court to deny relief when a claimant has unreasonably delayed asserting its claim if the delay has prejudiced the opposing party.  *Martin v. Dicklich*, 823 N.W.2d 336, 340 (Minn. 2012).  Application of laches is a factual determination that depends on the availability of the defense based upon the nature of the action, the reasons for the delay, existence of prejudice, and policy considerations.  *M.A.D. v. P.R.,* 277 N.W.2d 27, 29 (Minn. 1979).  The factual questions surrounding application of the laches doctrine resemble the discovery rule for the statute of limitations discussed above.  Because there remains a genuine dispute of material fact as to whether the creditors should have discovered the fraud sooner, there likewise remains a dispute as to whether the assertion of Ahlgren's claims was unreasonably delayed.

**CONCLUSION**

In sum, the Court finds few issues in these consolidated MUVTA cases that can be resolved at the summary judgment stage.  As to the unresolvable issues, the Court cannot

-41-

determine whether the Co-Op's creditors should have discovered the fraud earlier, and there remains an issue of fact whether any portion of Ahlgren's claims is outside the statute of limitations.  There also remain issues of fact as to whether Hennessey intended to defraud the Co-Op's creditors at the time of each transfer, and therefore the Court denies the Motions with respect to Count I for actual fraud.  However, the Court has determined that no reasonable jury could find that the Co-Op received reasonably equivalent value for Hennessey's payments to the Credit Card Defendants and thus, the Credit Card Defendants cannot sustain a good faith affirmative defense to the actual fraud claim.  As to constructive fraud, the parties' conflicting expert reports on the Co-Op's insolvency create a fact issue that must be resolved by a jury, and therefore the Court denies the Motions on Count II.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  ECF No. 19-303:

    a.  Plaintiff's Motion for Summary Judgment [Docket No. 105] is **DENIED;**

    b.  Defendants' Motion for Summary Judgment [Docket No. 126] is **DENIED;**

2.  ECF No. 19-305:

    a.  Plaintiff's Motion for Summary Judgment [Docket No. 70] is **DENIED**;

    b.  Defendants' Motion for Summary Judgment [Docket No. 92] is **DENIED**;

3. ECF No. 19-1576:

    a. Plaintiff's Motion for Partial Summary Judgment [Docket No. 61] is **DENIED**;

    b. Defendant's Motion for Partial Summary Judgment [Docket No. 79] is **DENIED**;

4. ECF No. 19-1607:

    a. Plaintiff's Motion for Partial Summary Judgment [Docket No. 63] is **DENIED**;

    b. Defendants' Motion for Partial Summary Judgment [Docket No. 80] is **GRANTED in part** and **DENIED in part**, as follows:

        i. **GRANTED** as to Defendant Capital One Bank (USA), National Association with respect to claims arising from transfers prior to September 25, 2017; and

        ii. **GRANTED** as to Defendant Cabela's Incorporated with respect to claims arising from transfers on and after September 25, 2017;

        iii. **DENIED** with respect to all other claims;

5. ECF No. 19-1647:

    a. Plaintiff's Motion for Partial Summary Judgment [Docket No. 50] is **DENIED**;

    b.  Defendant's Motion for Partial Summary Judgment [Docket No. 67] is

        **DENIED**;

6.  ECF No. 19-2385:

    a.  Plaintiff's Motion for Partial Summary Judgment [Docket No. 66] is

        **DENIED**; and

    b.  Defendants' Motion for Summary Judgment [Docket No. 73] is **DENIED**.


DATED:  August 16, 2021                    _____
at Minneapolis, Minnesota.                            JOHN R. TUNHEIM
                                                          Chief Judge
                                              United States District Court